UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,          Case No. 07-CR-0158 (PJS/FLN)

          Plaintiff,

v.                              MEMORANDUM
                                       OPINION

SCOTT ROBERT MEILLIER,

          Defendant.

---

Tricia A. Tingle, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Daniel Mohs, DANIEL MOHS & ASSOCIATES, LTD., for defendant.

In a three-count superseding indictment filed in July 2007, the government charged Scott Robert Meillier with violating 18 U.S.C. § 2252A by distributing, receiving, and possessing child pornography. Superseding Ind. [Docket No. 20]. Meillier pleaded guilty in October 2007 to one count of receiving child pornography in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1) as charged in Count 2 of the superseding indictment. Plea Agmt. Oct. 2, 2007 [Docket No. 28]. Meillier subsequently moved in September 2008 to withdraw his plea, and the Court granted the motion. Def. Mot. Withdraw Plea [Docket No. 42]; Minute Order [Docket No. 46].

Meillier then pleaded guilty in October 2008 to one count of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) as charged in Count 3 of the superseding indictment. Plea Agmt. Oct. 17, 2008 [Docket No. 49]. Following Meillier's plea, the Court held two evidentiary hearings — one in December 2008 and the other in February 2009 — to gather the information needed to determine an appropriate sentence for Meillier.

Earlier today, the Court sentenced Meillier to one day in prison, thirty years of supervised release (the first of which must be spent in a residential re-entry center), and 2000 hours of community service. This memorandum opinion sets forth the Court's underlying factual findings and explains the Court's reasons for imposing this sentence.

## I. FACTUAL FINDINGS

Officer Dale Hanson of the Minneapolis Police Department was working with Minnesota's Internet Crimes against Children Task Force in 2005 and 2006. Hr'g Tr. Feb. 12, 2009 ("Tr. II") at 7. In December 2005, Hanson discovered child-pornography image files that were available over the Internet from a computer connected to a peer-to-peer network. Tr. II at 10-12, 36. Hanson traced the computer to Meillier's home (he was living with his parents at the time), and Hanson and other police officers searched the house pursuant to a warrant in late January 2006. Presentence Investigation Rpt. Nov. 18, 2008 ("PSR") ¶¶ 8-9.[1] The police seized a computer and various disks from Meillier's bedroom. Tr. II at 37-39.

In examining the materials seized from Meillier's room, police found a total of 124 images of child pornography, of which four were in an Internet-accessible shared folder, twelve were on floppy disks, and 108 were on the computer's hard drive in non-Internet-accessible folders. PSR ¶¶ 8-9, 22. Police continued to investigate the case throughout 2006 and early 2007, and in May 2007, the government finally charged Meillier with distributing and possessing child pornography. Ind. May 8, 2007 [Docket No. 1]. Meillier was released on bond on May 17, 2007, under the supervision of the Court's Office of Pretrial Services. A grand jury returned a

---

[1]Meillier does not object to the factual information in the PSR, and the Court therefore relies on that information. *See* Def. Sent. Position at 1 [Docket No. 36].

superseding indictment on July 18, 2007; the superseding indictment added a charge of receiving

child pornography to the distribution and possession charges alleged in the initial indictment.

Meillier appeared at a hearing before the undersigned on October 2, 2007 and pleaded

guilty to receiving child pornography as charged in Count 2 of the superseding indictment.[2]

Immediately after the hearing, the undersigned made inquiries about ordering a psychological

evaluation of Meillier. At the time, the undersigned knew almost nothing about Meillier. But

the undersigned suspected, based on his limited interactions with Meillier at the hearing, that

something about Meillier was not quite right. The undersigned therefore asked the United States

Probation Office to arrange a full psychological evaluation of Meillier to assess, at a minimum,

whether he suffered from autism or an autism-spectrum disorder (such as Asperger's syndrome),

a learning disability, or any other cognitive impairment. Order Oct. 19, 2007 [Docket No. 29].

In response to the Court's request, the Probation Office arranged for Meillier to be

evaluated by Shannon Garrity, a psychologist. Garrity evaluated Meillier's cognitive abilities

and conducted a psychosexual evaluation to assess Meillier's amenability to sex-offender

treatment and his likelihood of reoffending. Garrity described her findings in a report dated

January 21, 2008. Garrity Rpt. at 1.[3] In conducting her evaluation, Garrity interviewed Meillier

_____

[2]As noted above, Meillier later withdrew this plea and instead pleaded guilty to possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) as charged in Count 3 of the superseding indictment. The charge of possessing child pornography, unlike the charge of receiving child pornography, does not carry a mandatory minimum term of imprisonment.

[3]Garrity's report was provided to the Court by the Office of Pretrial Services, and a copy is found in the undersigned's chambers file. The parties received a copy of the report, and neither the government nor Meillier objected to it.

for three hours, administered a number of psychological tests, interviewed Meillier's father, and reviewed records from Meillier's high school.  *Id.*

Meillier's attorney also retained two psychologists to evaluate Meillier.  The first psychologist, William L. Seabloom, is a certified sex therapist who focused on assessing Meillier from a psychosexual perspective.  Hr'g Tr. Dec. 18, 2008 ("Tr. I") at 43-44, 50-51.  Meillier attended roughly twelve two- to three-hour sessions with Seabloom from May to September 2008.  *Id.* at 45.  Seabloom prepared a report of his findings in September 2008, and the report was admitted into evidence without objection at an evidentiary hearing on December 18, 2008.  *Id.* at 42.  Seabloom also testified about his findings at that hearing.  *Id.* at 42-96.

In the course of assessing and treating Meillier, Seabloom referred Meillier to a second psychologist, Robert C. Barron, for a more general psychological assessment.  *Id.* at 45-46.  Barron prepared a report of his findings in June 2008; that report was also admitted into evidence without objection at the December 18, 2008 hearing.  In addition, Barron gave testimony at the hearing.  *Id.* at 38, 9-41.  Seabloom also referred Meillier to a medical doctor, Dr. Anton Makhlouf, for an assessment of Meillier's sexual functioning.  *Id.* at 49.  Seabloom described Makhlouf's findings both in his report and while testifying at the December 18 hearing.  Seabloom Rpt. at 9; Tr. I at 68-70.

The findings of Garrity, Seabloom, and Barron fall into three general categories.  The first category relates to Meillier's cognitive abilities.  The second category relates to his psychosexual profile, including his risk of reoffending.  The third category relates to Meillier's risk of being victimized in prison, which itself results from his cognitive impairments, his limited social skills,

his slight physical stature, and his history of victimization. The Court addresses each category of evidence in turn.

*A. Meillier's Cognitive Abilities*

The evidence overwhelmingly demonstrates that Meillier suffers from significant cognitive impairments. In particular, both Garrity (who was retained by the Court) and Barron (who was retained by the defendant) agree that Meillier's cognitive abilities are severely limited.

Barron administered an intelligence test (the third edition of the Wechsler Bellevue Intelligence Scale) to Meillier and received a valid result. Tr. I at 18. Barron described the test as "the gold standard of IQ testing . . . ." *Id.* According to Barron, Meillier's full-scale I.Q. is 70, which is "within the Mildly Retarded Range . . . ." Barron Rpt. at 3; Tr. I at 19. Roughly 98 percent of the general population has a higher full-scale I.Q. Barron Rpt. at 3; Tr. I at 19. Barron also found that data provided in Garrity's report showed Meillier to have a "mental age" equivalent to that of an average eleven-and-a-half-year-old child.[4] Barron Rpt. at 2. Barron concluded, based on his examination of Meillier, the tests he conducted, and the records he reviewed, that Meillier suffers from "Mild Mental Retardation." *Id.* at 5. Barron further opined that Meillier "meet[s] the definition of diminished capacity" with respect to his ability to understand or form the intent to commit the crimes with which he was charged in this case. *Id.* at 5-6; *see also* Tr. I at 21 ("I felt [Meillier] did meet the definition of diminished capacity.").

_____

[4]Garrity administered "the Shipley Institute of Living Scale to provide a gross estimate of [Meillier's] level of cognitive function." Garrity Rpt. at 6. She found that his raw scores were too low to calculate valid measures in certain respects. *Id.* Barron agreed that the particular measures considered by Garrity could not be validly calculated based on the raw scores she reported, but Barron found that "the Shipley does allow Mental Age Equivalent Scores to be calculated" from the raw scores reported by Garrity. Barron Rpt. at 2.

The conclusions of Garrity (the independent, Court-appointed expert) were similar. She found that Meillier had "marked impairment in cognitive functioning and social skills deficits." Garrity Rpt. at 9-10. Further, she described Meillier as "a slow and simple individual who is more likely to follow others than to lead, and [who] clearly has difficulty evaluating the future ramifications of his actions." *Id.* Garrity also observed that if Meillier were to undergo sex-offender treatment, he would need to participate in a program "specifically designed for persons with significant cognitive limitations where information is delivered in simple, concrete terms." *Id.* at 10; *see also id.* at 6 ("[H]e would benefit from a program of psychotherapy that is specifically designed for people who are limited in terms of their cognitive abilities.").

Garrity based her conclusions about Meillier's cognitive limitations on her interactions with and testing of Meillier as well as on his records from Faribault High School. *Id.* at 1. Those records show that Meillier was classified as mentally impaired by the school and received special-education services. *Id.* at 3; PSR ¶ 64; *see also* Barron Rpt. at 4 ("[Meillier] continued to receive Special Education Support Services for both speech and language, and learning, throughout his school career until the 12th grade."). Medical records from Meillier's high-school years likewise describe him as developmentally delayed and as receiving special-education services. Barron Rpt. at 2. Meillier quit high school in 2001, after the eleventh grade, with a grade-point average of 1.05. PSR ¶ 64. He earned his GED four years later, in 2005. PSR ¶ 65.

Garrity also reported that Meillier comes from a family with a history of mental retardation and mental illness. Garrity Rpt. at 3 (discussing Meillier's sister, who has mild mental retardation); *id.* at 4 ("Problems with schizophrenia and substance abuse are present on the paternal side of the family . . . ."). In addition, from a young age, Meillier was teased by

other children, who would call him"retarded" and an "idiot."  *See id.* at 3 ("[N]eighborhood children called the Meillier children 'retarded' . . . ."); *id.* ("Adolescence and young adulthood was [*sic*] marked by a lot of teasing . . . he was called 'retarded,' 'idiot,' and 'gay.'"); Barron Rpt. at 4 ("[D]uring his high school career he was constantly teased and picked on by his peers because of his learning problems . . . .").

Further, both Barron and Garrity found that Meillier's cognitive limitations were significant enough to interfere with certain aspects of their testing.  To assess Meillier's depression — which Barron found to be significant, Barron Rpt. at 3, 5 — Barron had to read aloud to Meillier the questions on the depression inventory.  *Id.* at 3; Tr. I at 19 ("I had basically to read him the items.").  This inventory is usually given in writing, but Barron "felt, based on [Meillier's] intellectual capabilities, that his comprehension of some of the items [on the inventory] would probably not be adequate for valid testing."  Tr. I at 20.  And Garrity reported that when she administered a sex-related questionnaire (the Multiphasic Sex Inventory or "MSI") to Meillier, he "required a significant amount of assistance on this measure [the MSI], as he did not understand many of the questions asked."  Garrity Rpt. at 7.

Finally, at around the time of the offense, Meillier had just begun to recognize that he might not fulfill his lifelong dream of becoming a professional wrestler.  Def. Sent. Position at 7 [Docket No. 36].  Meillier is five feet eight inches tall and weighs 140 pounds.

## B. Meillier's Psychosexual Profile

The evidence establishes that Meillier is not a sexual predator and is unlikely to reoffend. Specifically, the evidence establishes that Meillier has very limited sexual interest, experience, and capacity, and that he downloaded child pornography out of curiosity rather than out of compulsion or fixation. Barron, Garrity, and Seabloom all agreed, based on their interviews with Meillier and their review of the evidence, that Meillier is unlikely to reoffend.

### 1. Curiosity Versus Compulsion

Garrity, Seabloom, and Barron all agreed that Meillier's criminal actions did not reflect an underlying compulsion. According to Garrity:

> Considering his significant social delays and some amount of cognitive impairment, it is likely that Mr. Meillier accessed areas of the internet of which he had minimal experience. He may hold some amount of attraction to prepubescent males (and possibly females), though the amount of pornography discovered on his computer suggests he downloaded internet material in a manner more indicative of curiosity rather than fixation.

Garrity Rpt. at 9. Barron agreed with Garrity's assessment that Meillier's behavior was likely motivated by curiosity, not fixation. Tr. I at 21-22, 41.

Seabloom concurred. In particular, he testified that the variety of images downloaded by Meillier supports the conclusion that Meillier's conduct was "a matter strictly of curiosity." *Id.* at 85. The images downloaded by Meillier (which the Court was required to review to determine whether any images qualified as sadistic or masochistic for purposes of the United States Sentencing Guidelines) are not focused on one particular set of circumstances — e.g., an adult male having sex with a female adolescent, or a male child having sex with a male child — as one would expect if Meillier's behavior was driven by sexual fixation. Instead, Meillier possessed a

variety of images, including depictions of prepubescent males having sex with prepubescent males, prepubescent males having sex with prepubescent females, prepubescent males having sex with adolescent males, prepubescent females having sex with adolescent males, male adolescents having sex with male adolescents, female adolescents having sex with male adolescents, and prepubescent females having sex with male adults.

Seabloom also noted that given Meillier's approximate "mental age" of eleven and a half (based on Garrity's testing), "we need to be aware that his sexual interest and curiosity could also be of a child of that age." Seabloom Rpt. at 4. On this point, Seabloom testified that eleven and a half "would be an age at which children will be normally curious about sexuality . . . . They will search for information in lots of other areas because of that normal developmental level." Tr. I at 85.

2. Limited Sexual Interest, Experience, and Capacity

Seabloom testified that he found Meillier to have an "extremely — when I say 'extremely,' I mean it in capital letters — low[]level of sexual arousal or functioning." *Id.* at 81. Specifically, according to Seabloom's report:

> [Meillier] has masturbated, on his own, only twice. He has had only one positive adult sexual relationship with an adult female peer for about one year. It is unclear as to whether they were ever able to successfully engage in coitus. It is unclear as to whether he has ever been able to achieve orgasm or ejaculation.

Seabloom Rpt. at 10; *see also* Tr. I at 86 ("[Meillier] has had very, very few experiences of sexual arousal, very limited in terms of masturbation, and it's questionable even whether he has ever experienced an orgasm.").

Garrity's findings were consistent with Seabloom's. Under questioning from Garrity, it became clear that Meillier did not even know the meaning of the words "masturbate," "erection," and "ejaculate." Garrity Rpt. at 4. Meillier told Garrity that he had his first sexual experience at age twenty-five — that is, after he committed the offense. *Id.* at 5. Meillier also said, after Garrity defined the word "masturbation" for him, that he first masturbated at age twenty-five or twenty-six. *Id.* at 4.

Seabloom attributed Meillier's lack of sexual interest to both psychological and physical causes. Seabloom reported:

> Mr. Meillier has had little personal sexual interest or experience during his life to date. This is reportedly partly due to his medical issues and history, but also likely due to the repeated violent and sexual assaults he has been subjected to throughout his life. The findings in the literature support that Mr. Meillier has closed off sexual response and arousal as well as most sexual attraction. This would occur[] as a normal protective defense response for persons in his condition and life long situation.

Seabloom Rpt. at 10. Seabloom also testified that, according to an examination by a medical doctor, Meillier suffers from a variety of physical problems that would make sexual arousal "[v]ery difficult" and possibly even painful. Tr. I at 86. In particular, a doctor diagnosed Meillier with testicular pain related to scoliosis, abnormal cremasteric and bulbocavernosus reflexes,[5] and erectile dysfunction that could benefit from pharmacological treatment. Seabloom Rpt. at 9; Tr. I at 68-70; *id.* at 50 ("As we did our psychosexual evaluations . . . it seemed

_____

[5]The cremaster reflex is a muscle reflex that retracts the testicles. U.S. Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Undescended testicle," http://www.nlm.nih.gov/medlineplus/ency/article/000973.htm (last visited August 20, 2009). The bulbocavernosus reflex "is elicited by briskly squeezing the glans penis and observing or feeling a reflex contractility response of the external anal sphincter or bulbocavernosus muscle." Jay Young Gillenwater et al., *Adult and Pediatric Urology* 1131 (4th ed. 2001).

apparent that he likely had physiological conditions that would affect probably his sexual arousal and the ability of sexual functioning.").

### 3. Low Likelihood of Reoffending

All three professionals who evaluated Meillier agreed that he was not likely to reoffend. Garrity administered to Meillier the so-called Static-99, an instrument designed to measure a sex offender's risk of reoffending, and found that "his score of 1 is similar to a group of offenders at low risk for sexual re-offense." Garrity Rpt. at 8. And Barron testified that Meillier's "likelihood of reoffending is very low." Tr. I at 22; *see also* Tr. I at 29 ("I . . . did not feel that he is at significant risk to reoffend . . . .").

Further, no one — not Garrity, not Barron, not Seabloom — diagnosed Meillier as suffering from pedophilia or ephebophilia. *See* Garrity Rpt. at 8 (providing diagnosis of "Paraphilia, Not Otherwise Specified"). As noted above, all three professionals ascribed Meillier's offense to curiosity, not to fixation or compulsion. Seabloom reported: "Our extensive assessment reveals no sexual interest or arousal to minors and no behavior in this area." Seabloom Rpt. at 10. Seabloom testified that he was aware of "[n]o evidence" that would suggest that Meillier is a danger to children. Tr. I at 87.

To the extent that Meillier suffers from a mental illness, his most serious problem appears to be depression — a treatable condition — rather than a psychosexual disorder. Barron diagnosed Meillier as suffering (in addition to mild mental retardation) "Major Depressive Disorder, Single Episode, Severe, without Psychotic Features . . . ." Barron Rpt. at 5; *see also id.* at 3 ("[Meillier's] Raw Score of 35 on the Beck Depression Inventory . . . is within the Severely Depressed Range."); Tr. I at 20. Seabloom agreed and recommended that Meillier be referred to

a psychiatrist for assessment and possible pharmacological management of his "severe depression." Seabloom Rpt. at 9.

### 4. Meillier's Risk of Victimization

Meillier was sexually victimized repeatedly for years. The evidence establishes that there is an extremely high risk that if he is imprisoned — even for as little as a week or two — Meillier will be further physically and sexually assaulted.

As Barron put it, sending Meillier to prison would be like "throwing the goldfish in with the piranha." Tr. I at 23. Barron testified that given Meillier's cognitive limitations and his small size (as noted, he is about five feet eight inches tall and weighs about 140 pounds), Meillier "would be readily victimized [in prison] to say the least." *Id.* at 29; *see also id.* at 23 ("He would not fare very well at all I'm afraid."); Garrity Rpt. at 5 ("[Meillier] appears to be much younger than his stated age.").

Seabloom agreed. He testified, without contradiction, that if Meillier were imprisoned, he would likely be victimized "*almost immediately.*" Tr. I at 57 (emphasis added). Seabloom based this conclusion in part on Meillier's lengthy history of victimization, which Seabloom described as follows:

> [W]e have learned from Mr. Meillier that he was repeatedly subject to sexual assault, including anal rape, from early childhood through adolescence. . . . The sexual assaults, including oral and anal rape, reportedly began around age five and were initiated by an adult male in his extended family. These occurred repeatedly over several years. Around age ten to twelve, an adolescent male relative reportedly forcefully anally penetrated him, and forcefully masturbated him three or four times. During his pre[]pubertal period, older boys would force him to fellate them until they ejaculated, masturbated him and forcefully penetrated him anally. At age fourteen or fifteen, a female co-worker reportedly

> repeatedly would grab him and hug him against his will and on one
> occasion grabbed his buttocks and, during later adolescence, a
> female assistant manager reportedly groped him. During this
> period he also reported that the same older male relative again
> masturbated and anally penetrated him.

Seabloom Rpt. at 9-10; *see also* Tr. I at 53-55 (testimony of Seabloom about abuse). According to Seabloom, Meillier would be a target of abuse in any prison setting, whether specifically for sexual offenders or not, because "his entire life he has been a victim . . . ." Tr. I at 56.

Some of the abuse that Meillier described to Seabloom occurred while Meillier was an adult. After consulting with other professionals, Seabloom determined that, because of his "[m]ental and physical status," Meillier was a vulnerable adult for purposes of the mandatory abuse-reporting statutes, and Seabloom reported to law enforcement the abuse that Meillier had suffered *as an adult*. *Id.* at 55-56.

Seabloom also testified that Meillier would be unable to protect himself in a prison setting. *Id.* at 89 (answering, in response to a question about whether Meillier could protect himself in prison: "Not at all."). In particular, Seabloom testified that "from infancy on" Meillier has never been able to stay away from dangerous people and associate with safe people, and Meillier would likewise be unable to avoid dangerous people in prison. *Id.* Similarly, Garrity found that Meillier is a follower, not a leader, and is easily manipulated. Garrity Rpt. at 9.

Further, there is no evidence that Meillier would be able to keep the nature of his offense hidden from his fellow inmates if he were sent to prison. As the undersigned said at the December 2008 sentencing hearing, the undersigned was advised by the Probation Office that if Meillier is sent to prison, he should develop a cover story so that his fellow inmates will not

know that he committed a sex crime.  Tr. I at 89.  But in response to a question from the undersigned about whether Meillier could maintain such a cover story, Seabloom replied:  "No. He would not be able to maintain that."  *Id.*  The Court is aware of no evidence that Meillier is capable of maintaining a cover story in prison, as suggested by the Probation Office.

Finally, Meillier's vulnerability is illustrated by his apparent inability to care for himself in even the most basic ways.  For instance, he lost all of his teeth when he was twenty-one, apparently because he failed to use basic dental hygiene.  PSR ¶ 49.  He has either been fired from or has quit a variety of jobs doing menial labor.  PSR ¶¶ 67-72; Barron Rpt. at 4 ("Since high school, [Meillier] has had difficulty maintaining steady employment until the past year when he has worked at Kentucky Fried Chicken, cooking chicken, washing dishes and doing clean-up work.").  And Meillier seems to have great difficulty showing up for appointments. *See* Garrity Rpt. at 6 (stating that Meillier was three hours late for each of his two appointments); Barron Rpt. at 3 ("In spite of having directly called the psychologist [i.e., Barron] two days previously to confirm his 9:00 appointment on Friday, June 6th, he failed to arrive at the scheduled time.  A call was made to his home . . . .  Mr. Meillier arrived almost three hours after the originally scheduled appointment time.").  Barron commented that Meillier's tardiness "appears consistent with other clinical indications of Mr. Meillier's lack of organizational and planning capabilities."  Barron Rpt. at 3.  *But see* Tr. I at 64 (testimony of Seabloom that Meillier "was generally very responsible" in coming to appointments).

## II. DISCUSSION

### A. Governing Law

Sentencing in criminal cases is governed by 18 U.S.C. § 3553(a), which directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the purposes of sentencing as set forth in the statute. 18 U.S.C. § 3553(a). Before *United States v. Booker*, courts had no choice but to impose sentences within the ranges set by the United States Sentencing Guidelines. 543 U.S. 220, 233-34 (2005) (opinion of Stevens, J., for the Court) (describing guidelines as "mandatory and binding on all judges" under 18 U.S.C. § 3553(b)). But *Booker* rendered the guidelines "effectively advisory." *Id.* at 245 (opinion of Breyer, J., for the Court).

Under *Gall v. United States,* the guidelines nevertheless remain "the starting point and the initial benchmark" in determining an appropriate sentence, and courts must therefore calculate the applicable guidelines range in every case. 128 S. Ct. 586, 596 (2007). Courts may not, however, "presume that the Guidelines range is reasonable," but must instead "make an individualized assessment based on the facts presented." *Id.* at 596-97.

Further, different sentencing guidelines merit different levels of consideration by district courts. The Supreme Court held in *Rita v. United States* that the guidelines range will usually "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." 551 U.S. 338, 350 (2007). *Kimbrough v. United States* explained that this is because most guidelines are developed by the Sentencing Commission in its "important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" 128 S. Ct. 558, 574 (2007) (quoting *United*

*States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). But when

certain guidelines "do not exemplify the Commission's exercise of its characteristic institutional

role" and are not based on empirical data and national experience, those guidelines are entitled to

less deference from district courts. *Id.* at 575 (holding that, with respect to crack-cocaine

guidelines, "it would not be an abuse of discretion for a district court to conclude when

sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than

necessary' to achieve § 3553(a)'s purposes, even in a mine-run case"). And, as Chief Judge

Bataillon of the District of Nebraska explained in *United States v. Grinbergs*, "[t]he Guidelines

for child exploitation offenses were not developed under the empirical approach, but were

promulgated, for the most part, in response to statutory directives." No. 8:05CR232, 2008 WL

4191145, *5, 2008 U.S. Dist. LEXIS 91712, *14 (D. Neb. Sept. 8, 2008). In other words, the

guidelines for child-pornography offenses are, to a substantial extent, driven by politics, not

science.

## B. Application of Sentencing Guidelines[6]

The parties agree that under the United States Sentencing Guidelines ("USSG") and as set

forth in the PSR, the applicable offense level is 25. This offense level is calculated as follows:

Because Meillier pleaded guilty to violating 18 U.S.C. § 2252A(a)(5)(B), his base offense

level under § 2G2.2(a)(1) of the guidelines is 18. A two-level enhancement applies under

§ 2G2.2(b)(2) because some of the images possessed by Meillier depict prepubescent minors.

Another two-level enhancement applies under § 2G2.2(b)(6) because the offense involved a

---

[6]References in this opinion to the guidelines are to those found in the November 1, 2008
edition of the United States Sentencing Guidelines Manual.

computer, and a third two-level enhancement applies under § 2G2.2(b)(7)(A) because Meillier possessed 124 images of child pornography. A four-level enhancement applies under § 2G2.2(b)(4) because some of the images portray sadistic or masochistic conduct,[7] which brings the total offense level, before reductions, to 28. Because he accepted responsibility for his crime by pleading guilty, and because the government moved for a reduction of his offense level on this basis, Meillier is also entitled to a three-level reduction in his offense level under § 3E1.1(a) and (b). Thus, Meillier's total offense level is 25.

Meillier has no criminal record apart from two driving-related offenses (failure to have proof of insurance and driving after his license had been revoked). PSR ¶¶ 30-31. He therefore has zero criminal-history points and a criminal-history category of I. PSR ¶ 32. Given an offense level of 25, Meillier's recommended sentence under the guidelines is 57 to 71 months. USSG Ch. 5 Part A (Sentencing Table).

Meillier moves for a departure under § 5K2.0(a)(2) of the guidelines, which in some cases allows for departures based on circumstances not adequately taken into consideration in the guidelines calculations. Def. Sent. Position at 3-4. But subsection (a) of § 5K2.0 does not apply

---

[7]Meillier initially challenged the application under § 2G2.2(b)(4) of the enhancement for sadistic and masochistic images, and the Court upheld the challenge after finding that the single image on which the government relied for the enhancement was not sadistic or masochistic. *United States v. Meillier*, No. 07-CR-0158 (PJS/FLN), 2008 WL 2564128 (D. Minn. June 25, 2008). The government then offered additional images to support the enhancement, and Meillier conceded that some of those images depict sadistic or masochistic conduct, and that the four-level enhancement under § 2G2.2(b)(4) is therefore proper. Tr. I at 5-6. Meillier's concession reflects the fact that the Eighth Circuit has defined the key phrase in § 2G2.2(b)(4) — "material that portrays sadistic or masochistic conduct" — very broadly to include any image that depicts the oral, vaginal, or anal penetration of a minor by a substantially older person (even another minor). *See United States v. Diaz*, 368 F.3d 991, 992 (8th Cir.2004). Several of the images possessed by Meillier depicted the penetration of a prepubescent minor by an adolescent or adult.

to offenses found within chapter 110 of Title 18 of the United States Code, such as the violation of 18 U.S.C. § 2252A(a)(5)(b) to which Meillier pleaded guilty. *See* USSG § 5K2.0 cmt. n.4.

Instead, departures in cases involving sexual offenses and crimes against children are governed by § 5K2.0(b) of the guidelines. And under § 5K2.0(b)(1), courts are forbidden to depart downward under the sentencing guidelines unless the basis for the departure "has been affirmatively and specifically identified as a permissible ground of downward departure" in § 5K of the guidelines. Further, § 5K2.13 expressly forbids courts to depart downward under the guidelines on the basis of a defendant's diminished capacity if the defendant was convicted of certain offenses, including offenses (such as Meillier's) under chapter 110 of Title 18 of the United States Code.

Meillier has not identified any permissible basis for a downward departure under § 5K2.0(b), and the Court finds that none exists. The Court therefore does not depart downward under the guidelines.

### C. Statutory Sentencing Factors

Although the Court cannot depart downward under the guidelines, the Court finds that a sentence within the guidelines range of 57 to 71 months would be unwarranted and unjust in light of the totality of the sentencing factors set forth in 18 U.S.C. § 3553(a). The guidelines range is, of course, one of those factors, as specified in § 3553(a)(4)(A). And under § 3553(a)(5), the Court must also consider the policy statements found in the sentencing guidelines. The Court has therefore carefully considered the sentencing guidelines in deciding what sentence to impose.

But in this very unusual case, the other § 3553(a) factors weigh heavily against imposing more than a nominal prison term. The Court has therefore sentenced Meillier to one day of

imprisonment, followed by thirty years of supervised release. (The Court imposes one day of imprisonment, instead of probation, because a court cannot impose a term of supervised release after probation; rather, imprisonment of at least one day is necessary.[8]) Further, Meillier will be required to serve his first year of supervised release in a residential re-entry center. In addition, Meillier must perform 2000 hours of community service. The Court discusses below how it has arrived at this sentence in light of the remaining § 3553(a) factors that are relevant in this case.

### 1. Nature and Circumstances of the Offense

Under § 3553(a)(1), the Court must consider the "nature and circumstances of the offense" in deciding what sentence to impose. 18 U.S.C. § 3553(a)(1). All child-pornography offenses are very serious, of course, but Meillier's child-pornography crime is less serious than most such offenses that have been prosecuted before the undersigned.

As discussed above, the evidence shows that Meillier downloaded child pornography for only about two months, from December 2005 to January 2006. There is no evidence or allegation that Meillier ever abused or attempted to abuse a child or that he has ever acted inappropriately in any way toward any child. *See* Tr. I at 87. There is also no evidence or allegation that he has ever been involved in producing child pornography.

Instead, the evidence shows that Meillier downloaded 124 images, of which only four were found in shared, internet-accessible folders. Although Meillier was charged with

---

[8]A lengthy term of supervised release is necessary in this case both to protect the public and to provide Meillier with needed assistance. Under 18 U.S.C. § 3583(a), the Court is permitted to impose supervised release only "in imposing a sentence to a term of imprisonment . . . ." 18 U.S.C. § 3583(a). The Court therefore sentenced Meillier to a day in prison, rather than to a term of probation, so that the Court could also impose a lengthy term of supervised release, which includes a period of community confinement as well as numerous conditions with which Meillier must comply.

distributing child pornography based on those four images, he did not plead guilty to that charge, and given Meillier's cognitive limitations, it is doubtful that the government could establish that he knowingly distributed child pornography. In short, although possessing child pornography is a very serious crime, as such crimes go, Meillier's was relatively modest in scale.

2. Meillier's History and Characteristics

The Court must also consider the "history and characteristics of the defendant" under § 3553(a)(1). 18 U.S.C. § 3553(a)(1). This factor weighs heavily against imposing a substantial prison sentence in this case.

As discussed at length above, Meillier is mentally retarded; he is, intellectually speaking, an eleven-and-a-half-year-old boy. No court would sentence an eleven-and-a-half-year-old boy to a lengthy term in a federal penitentiary for downloading images of other children engaged in sexual activity.

Further, Meillier has a lengthy history of being physically and sexually victimized. He has repeatedly suffered horrific sexual abuse — abuse as horrific as anything portrayed in the images he downloaded. Moreover, given his mental and physical characteristics, Meillier is at great risk of being further victimized in prison — even if he is incarcerated for only a few weeks. Sentencing a defendant like Meillier to a lengthy prison sentence is the equivalent of sentencing him to be physically and sexually abused. When the defendant cannot protect himself because of his mental retardation and small physical stature, such a sentence would be inhumane.

Importantly, Meillier downloaded child pornography out of curiosity, not fixation. The evidence established that Meillier has limited interest in or capacity for sexual activity of any kind.

In addition, Meillier has no criminal record (apart from two traffic offenses) and has no history of using illegal drugs or abusing alcohol. PSR ¶¶ 30-31, 61; Garrity Rpt. at 4. He has been free on bond for more than two years, and has complied with all of his bond conditions. PSR ¶ 4.

By all accounts, Meillier is a shy, slight, mentally retarded young man who lives at home with his parents and whose only serious criminal offense has been using a computer in his bedroom to download child pornography over a two-month period. Under the circumstances, a significant prison sentence, with its attendant risks of victimization, cannot be justified.

### 3. Seriousness of the Offense, Respect for the Law, and Just Punishment

Under § 3553(a)(2)(A), the Court must consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense . . . ." 18 U.S.C. § 3553(a)(2)(A). Under the highly unusual circumstances of this case, the Court finds that a significant sentence of imprisonment would in fact provide *unjust* punishment for Meillier's offense.

Meillier is an atypical defendant, and the Court is therefore imposing an atypical sentence. Overly harsh punishment and overly lenient punishment are both unjust forms of punishment, as Congress acknowledged in directing courts to impose a sentence "sufficient, but *not greater than necessary*," to meet the goals of sentencing. 18 U.S.C. § 3553(a) (emphasis added). Further, respect for the law is promoted when courts enforce the law fairly under the circumstances, as § 3553(a) directs and as the Court has attempted to do in this case.

The Court does not intend to diminish the seriousness of Meillier's offense by declining to impose a sentence of imprisonment (beyond one day). Rather, in recognition of the

seriousness of Meillier's offense, the Court has imposed a thirty-year tem of supervised release, during which Meillier will have to comply with a number of stringent conditions. Meillier will also have to spend the first of his thirty years on supervised release in a residential re-entry center. During his term of supervised release, Meillier will remain under the close supervision of the Court, and if he violates any of the many conditions of his supervised release, he will face the possibility of a prison sentence. Finally, Meillier will be required to do 2000 hours of community service.

### 4. Deterrence

The Court must consider, under § 3553(a)(2)(B), whether the sentence imposed adequately deters criminal conduct. 18 U.S.C. § 3553(a)(2)(B). Although a general practice of leniency in criminal cases would deter criminal conduct less effectively than a general practice of meting out harsh sentences, the Court has written this lengthy memorandum opinion so as to make clear that this case involves extremely unusual facts. Run-of-the-mill defendants convicted of run-of-the-mill child-pornography offenses can continue to expect to receive substantial prison sentences along the lines of those recommended in the sentencing guidelines.

The Court finds that Meillier himself does not need a significant prison sentence to further deter him from downloading child pornography. Meillier will be sufficiently deterred from reoffending by his conviction in this case; the three-plus years his life has been in limbo while he first waited to be charged and then waited to be sentenced; the thirty years he will have to spend on supervised release, with many of his freedoms curtailed; the year he will be confined in a residential re-entry center; and the 2000 hours of community service that he will have to perform.

### 5. Protection of the Public

The Court must consider, under § 3553(a)(2)(C), whether the sentence imposed will protect the public from further crimes by the defendant. 18 U.S.C. § 3553(a)(2)(C). The evidence establishes that Meillier is not likely to commit further crimes, regardless of his sentence in this case. Indeed, there is evidence that if the Court sentenced Meillier to a significant prison term, he might become *more* dangerous to the public than he is now. According to Barron, if Meillier went to prison, he would likely be victimized and "come out probably far more damaged than he is now." Tr. I at 32. The Court therefore finds that to protect the public in this case, the best approach is that taken by the Court: close supervision of Meillier during the thirty years that he will spend on supervised release.

### 6. Treatment and Training

The Court must consider, under § 3553(a)(2)(D), whether the sentence imposed will "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." 18 U.S.C. § 3553(a)(2)(D). The Court finds, given Meillier's cognitive limitations, personal history, and psychological problems, that he could benefit from vocational and psychological assistance. The Court does not, however, believe that such assistance could be effectively provided in prison. Instead, the Court believes that Meillier could benefit from services provided to him in the community, and the Court has therefore ordered that he remain on supervised release for thirty years, which will take him well into middle age. During the supervised-release term, the Probation Office will be able not only to monitor Meillier to ensure that he does not reoffend, but also to assist him in finding work and in receiving needed medical and psychological treatment. The Court finds that both Meillier and

society at large will be better off if Meillier is under the ongoing supervision of the Probation Office.

## 7. Sentence Disparities

Finally, the last § 3553(a) factor relevant to this case is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." 18 U.S.C. § 3553(a)(6). Given that the recommended sentencing range under the guidelines is based on the defendant's criminal record and the nature of the offense, a sentence within the guidelines range in this case would likely be closer to sentences imposed on defendants with similar criminal records for similar offenses. But under § 3553(a)(6), the Court must consider "the need to avoid *unwarranted* sentence disparities . . . ." *Id.* (emphasis added). For the reasons given above, the Court finds that any disparity in sentencing between Meillier's sentence and the sentences given for similar offenses to defendants with similar records is warranted by this case's unique circumstances.

## III. CONCLUSION

Congress has prescribed harsh penalties — including lengthy prison sentences — for child-pornography offenses. In most cases, such lengthy sentences are appropriate, and the undersigned has not hesitated to impose lengthy sentences in the past. Indeed, in one child-pornography case, the undersigned imposed a sentence that the Eighth Circuit described as "harsh." *United States v. Paton*, 535 F.3d 829, 838 (8th Cir. 2008).

But those convicted of crimes — even crimes as heinous as possessing child pornography — are human beings, and no two human beings are alike. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Under the unique circumstances of this case — a mentally retarded young man who has himself been the victim of horrific sexual abuse, who has no criminal record (save traffic citations), who viewed relatively few images of child pornography out of curiosity rather than compulsion, who is unlikely to be a danger to any child or even to look at child pornography again, and who will almost surely be physically and sexually victimized if sent to prison — imposing more than a nominal term of imprisonment would actually be contrary to the purposes set forth in § 3553(a). The Court therefore sentenced Meillier to one day in prison, thirty years of supervised release (of which the first year must be served in a residential re-entry center), and 2000 hours of community service.

Dated: August 24, 2009

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge